### 44942. RIVERS v. LYNCH et al.
(361 SE2d 162)

GREGORY, Justice.

Appellee Lynch owned a garage and body shop. Eager to become involved in another line of work, he discussed with Jack Wilkins[1] the possibility of going into the mortgage brokerage business with which Wilkins had some experience. Wilkins opened up a mortgage brokerage office in Lynch's body shop. Wilkins also introduced appellant Rivers to Lynch. Rivers was a medical equipment technician who was interested in becoming involved in the mortgage brokerage business,

---

[1] Wilkins has not filed an appeal in this case.

and began coming to the office set up in Lynch's body shop to learn this business. Neither Lynch nor Rivers were compensated at any time for their work with Wilkins.

During the time the three men were associated the only loan closed was for the refinancing of Lynch's home. Wilkins spent most of his time attempting to obtain financing to purchase 175 acres of land in Nashville, Tennessee on which he hoped to develop a "music theme park." Wilkins ultimately located a bank in the West Indies which agreed to provide $2.6 million in financing for the purchase and development of this land on condition that Wilkins provide $50,000 as a commitment fee. It is undisputed that Wilkins falsified a financial statement in order to procure approval for this financing.[2] Wilkins approached Rivers for a loan of the amount of the commitment fee, but Rivers refused because the collateral Wilkins offered was too heavily mortgaged. It is undisputed that *Lynch then approached Rivers* and offered his body shop for collateral if Rivers would provide $26,000 toward the commitment fee. Rivers agreed, and mortgaged his home in order to obtain these funds. Lynch executed a promissory note in this amount and a deed to secure debt on his garage and body shop in favor of Rivers. The evidence shows that Rivers then drew $12,757 from his account in a check made payable to Rivers and Wilkins. There is some evidence to show that Rivers and Wilkins then endorsed this check and wired this amount to the bank in the West Indies. Lynch did not see this money nor did he participate in this transaction; his testimony is that he does not know what happened to the $26,000. There is evidence to show that the remainder of the $26,000 was placed in escrow and subsequently paid to the West Indies bank. Lynch testified that following these transactions Wilkins would not give information to him or to Rivers concerning the status of this financing arrangement. Lynch's testimony is that Rivers repeatedly came to Lynch for information about the project because Wilkins would not discuss it with Rivers. Lynch also testified Wilkins told him if the "deal fell apart," Rivers' money would be returned, and Lynch would get the title back to his garage. Wilkins thereafter moved to Nashville, Tennessee to "supervise" the project.

The financing arrangement with the West Indies bank ultimately collapsed due to the failure to pay the remaining amount of the commitment fee. Wilkins' testimony is that his demand on the bank for return of the $26,000 was refused. Lynch testified that after learning that the financing had fallen through, Rivers advised him to consult an attorney to determine if Lynch could recover the $26,000 from

---

[2] Lynch testified Wilkins told him that the net worth Wilkins showed on the financial statement was "on paper" and would not come into Wilkins' possession until he reached the age of 40.

Wilkins so that Lynch could pay off the promissory note and cancel the deed to secure debt. It is undisputed that Rivers gave Lynch several extensions on payment under the note in order to try to raise the money. When Rivers finally instituted foreclosure proceedings under the deed to secure debt, Lynch filed this lawsuit against Wilkins and Rivers, alleging a conspiracy to defraud him of his property, and seeking damages, cancellation of the promissory note and deed to secure debt, and an injunction against foreclosure on the property.

At trial Lynch testified that Rivers made no representations to him to induce Lynch to execute the promissory note or put his garage up as collateral for the loan.[3]

The jury initially returned a verdict in favor of Lynch and against Wilkins in the amount of $26,000. The jury also found "for [Lynch] a stay of foreclosure until the amount is received by [Lynch]." The trial court instructed the jury that it could not condition the stay of foreclosure in the suit against Rivers on satisfaction of the judgment against Wilkins. Lynch then announced that he was not seeking a money judgment, but only a judgment cancelling the note and deed to secure debt. The jury resumed deliberations and returned with a verdict which stated, "We, the jury, find against both defendants and hereby void the note, the deed to secure debt and permanently enjoin the foreclosure by defendant Michael L. Rivers."

The trial court made the jury verdict the judgment of the court. Rivers appeals from the trial court's denial of his motions for directed verdict and judgment notwithstanding the verdict.

We have carefully scrutinized the record in this case and have found no evidence to support the jury's verdict that appellant Rivers committed any acts of fraud upon Lynch. Therefore, the trial court erred in denying Rivers' motion for judgment notwithstanding the verdict. OCGA § 9-11-50.

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 21, 1987 —
RECONSIDERATION DENIED NOVEMBER 4, 1987.

*Walker L. Chandler,* for appellant.
*Harold E. Martin, John McGuigan, Jr.,* for appellees.

---

[3] Lynch's position is that the "loan" was actually made to Wilkins, and not to Lynch.